15 CV 11743
RGS

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
| --- | --- |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF LAWRENCE, MASSACHUSETTS, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| COMMONWEALTH OF MASSACHUSETTS, | ) |
| | ) |
| Nominal Party required by | ) |
| 33 U.S.C. § 1319(e). | ) |
| | ) |

CIVIL ACTION NO.

TABLE OF CONTENTS

I.      STATEMENT OF CLAIM ................................................................... 4
II.     JURISDICTION AND VENUE .......................................................... 4
III.    APPLICABILITY ............................................................................... 4
IV.     DEFINITIONS .................................................................................... 6
V.      OBJECTIVES ................................................................................... 10
VI.     REMEDIAL MEASURES ............................................................... 11
VII.    COMPLIANCE REPORTING ......................................................... 31
VIII.   APPROVAL OF SUBMISSIONS .................................................... 34
IX.     STIPULATED PENALTIES ............................................................ 35
X.      FORCE MAJEURE .......................................................................... 39
XI.     DISPUTE RESOLUTION ................................................................ 41
XII.    RIGHT OF ENTRY/INFORMATION COLLECTION AND
        RETENTION .................................................................................... 44
XIII.   FORM OF NOTICE ......................................................................... 46
XIV.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........... 48
XV.     COSTS ............................................................................................. 50
XVI.    EFFECTIVE DATE .......................................................................... 51
XVII.   RETENTION OF JURISDICTION ................................................. 51
XVIII.  MODIFICATION ............................................................................. 51
XIX.    FUNDING ........................................................................................ 52
XX.     SEVERABILITY .............................................................................. 52
XXI.    TERMINATION ............................................................................... 52
XXII.   FINAL JUDGMENT ........................................................................ 53
XXIII.  WAIVER OF SERVICE ................................................................... 53
XXIV.   PUBLIC COMMENT ....................................................................... 53
XXV.    SIGNATORIES ................................................................................ 54
XXVI.   INTEGRATION ............................................................................... 54
XXVII.  APPENDICES .................................................................................. 54

## CONSENT DECREE

WHEREAS, the City of Lawrence, Massachusetts (the "City" or "Lawrence") discharges pollutants into navigable waters of the United States from a publicly owned treatment works ("POTW") pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. MA0100447 ("GLSD Permit"), which was reissued on August 11, 2005, to the Greater Lawrence Sanitary District and its member communities;

WHEREAS, Lawrence also discharges pollutants into navigable waters of the United States from a municipal separate storm sewer system ("MS4") pursuant to NPDES Permit No. MAR041201 ("Small MS4 General Permit");

WHEREAS, the plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint simultaneously with this Consent Decree alleging that the City has violated the GLSD Permit, the MS4 Permit, and Section 301(a) of the Clean Water Act ("Act" or "CWA"), 33 U.S.C. § 1311(a);

WHEREAS, Section 309(e) of the Act, 33 U.S.C. § 1319(e), requires that whenever the United States brings a civil enforcement action against a municipality under Section 309, the state in which the municipality is located shall be joined as a party and the Commonwealth of Massachusetts (the "Commonwealth") was named as a necessary party in the United States' Complaint;

WHEREAS, entry of this Consent Decree by the Court will resolve all claims in the complaint of the United States;

WHEREAS, the United States has performed an analysis of Lawrence's ability to pay a civil penalty in this matter and determined that the City does not have the ability to pay the

3

substantial penalty warranted by the facts of this case without jeopardizing the implementation of necessary improvements related to the City's wastewater treatment works;

WHEREAS, the United States and the City (collectively, the "Parties") agree, and the Court by entering this Consent Decree finds, that the Consent Decree is fair and reasonable and has been negotiated in good faith, is in the public interest, and that entry of this Consent Decree without further litigation is an appropriate resolution of the dispute.

NOW, THEREFORE, it is hereby ordered, adjudged, and decreed as follows:

## I. STATEMENT OF CLAIM

1. The Complaint states claims upon which relief can be granted against the City pursuant to Section 309 of the CWA, 33 U.S.C. § 1319.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to Section 309(b) of the CWA, 33 U.S.C. §1319(b), and 28 U.S.C. §§ 1331, 1345, and 1355, and under the doctrine of pendent jurisdiction. This Court has personal jurisdiction over the Parties to this Consent Decree. Venue properly lies in this district pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), 28 U.S.C. §§ 1391(b) and (c), and 28 U.S.C. § 1395(a). The City waives all objections it might have raised to such jurisdiction or venue.

## III. APPLICABILITY

3. The provisions of this Consent Decree shall apply to and be binding upon the City and its officers, directors, agents, employees acting in their official capacities, its successors, and assigns.

4. No transfer of any ownership interest in or any interest in the operation of the City's

4

Collection System or MS4, whether in compliance with this Paragraph or otherwise, shall relieve the City of its obligation to ensure that the terms of this Consent Decree are implemented. Any transfer involving ownership or operation of the Collection System or MS4, or any portion thereof, to any other person or entity must be conditioned upon the transferee's agreement to be added as a party to the Consent Decree and to be jointly and severally liable with the City to undertake all obligations required by the provisions of the Consent Decree. At least thirty (30) Days prior to such transfer, the City shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the above-referenced proposed written agreement, to EPA, the United States Attorney, and the United States Department of Justice in accordance with Section XIII (Form of Notice). Any noncompliance with this Paragraph constitutes a violation of this Consent Decree.

5. · The City shall provide a copy of this Consent Decree to all officers and agents whose duties might reasonably include compliance with any provisions of this Consent Decree. The City shall also provide a copy of this Consent Decree to all contractors and consultants retained to perform any obligation required by this Consent Decree on behalf of the City, and condition any such contract upon performance of the work in conformity with the terms of this Consent Decree. The City shall require that such contractors and consultants provide a copy of this Consent Decree to their subcontractors to the extent the subcontractors are performing work subject to this Consent Decree. Such contractors, consultants, and subcontractors shall be deemed agents of the City for the purposes of this Consent Decree. In an action to enforce this Consent Decree, the City shall not assert as a defense against an action by EPA the failure by any of its officers, directors, employees, agents, servants, consultants, engineering firms, contractors,

successors, and assigns to take actions necessary to comply with this Consent Decree.

## IV. DEFINITIONS

6. Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in the CWA or in regulations promulgated under the CWA shall have the meaning ascribed to them in the CWA or in the regulations promulgated thereunder. Whenever the terms listed below are used in this Consent Decree, the following definitions shall apply.

a. "Act" or "CWA" shall mean the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act), as amended, 33 U.S.C. §§ 1251-1387.

b. "Approval by EPA" or "Approved by EPA" shall mean the issuance of a written approval document from EPA approving or approving with conditions a submission in accordance with Section VIII (Approval of Submissions).

c. "Best Management Practices or BMPs" shall mean schedules of activities, practices and prohibition of practices, structures, vegetation, maintenance procedures, and other management practices to prevent or reduce the discharge of pollutants to waters of the United States. BMPs also include treatment requirements, operating procedures, and practices to control plant site and road runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage.

d. "Building/Private Property Backup" shall mean any release of wastewater from the Collection System into buildings or onto private property, except a release that is the result of blockages, flow conditions, or malfunctions of a building lateral or other piping/conveyance system that is not owned or operationally controlled by the City, or is the result of overland surface flooding not emanating from the Collection System.

6

e. "Collection System" shall mean the wastewater collection, storage and transmission system (including separate sanitary and combined sewers) owned or operated by the City, including, but not limited to, all devices, sewersheds, pump stations, force mains, gravity sewer lines, manholes, and appurtenances.

f. "Commonwealth" shall mean the Commonwealth of Massachusetts.

g. "Complaint" shall mean the complaint filed by the United States in this action.

h. "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto. In the event of conflict between this Decree and any appendix, this Decree shall control.

i. "Construction Sites" shall mean any development or redevelopment or other construction activity of a site, parcel, and/or building that is projected to disturb equal to or greater than one (1) acre of land. Construction Sites shall include sites of less than one acre of total land area that is part of a larger common plan of development or sale if the larger common plan will ultimately disturb equal to or greater than one acre.

j. "Date of lodging" shall mean the Day this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the District of Massachusetts.

k. "Day" shall mean a calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or Commonwealth holiday, the period shall run until the close of business of the next business day.

l. "Effective Date" shall have the definition provided in Section XVI (Effective Date).

m. "EPA" shall mean the United States Environmental Protection Agency and

7

any successor departments or agencies of the United States.

n. "Exfiltration" shall mean the water that exits the Collection System (including sewer service connections) through such means as, but not limited to, defective pipes, pipe joints, connections or manhole structures.

o. "Flow" shall mean all stormwater and sanitary (domestic, commercial and industrial wastewaters) wastewater conveyed by any portion of the Collection System.

p. "Green Infrastructure/Low Impact Development (GI/LID)" shall mean the range of stormwater control measures that use natural or engineered systems to direct stormwater to areas where it can be stored, infiltrated, evapotranspirated, or reused. GI/LID may include, but is not limited to, bioretention and extended detention wetland areas, vegetated swales, pocket wetlands, rain gardens, infiltration planters, green roofs, and porous and permeable pavements.

q. "IDDE" shall mean illicit discharge detection and elimination.

r. "Infiltration" shall mean the water that enters the Collection System (including sewer service connections) from the ground through such means as, but not limited to, defective pipes, pipe joints, connections or manholes. Infiltration does not include, and is distinguished from, Inflow.

s. "Inflow" shall mean all water that enters the Collection System and sewer service connections from sources such as, but not limited to, roof leaders, cellar drains, yard drains, sump pumps, area drains, foundation drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, stormwaters, surface runoff, street wash waters, or drainage. Inflow does not include, and is distinguished from, Infiltration.

8

t.    "Infiltration/Inflow" or "I/I" shall mean the total quantity of water from both Infiltration and Inflow without distinguishing the source.

u.    "MassDEP" shall mean the Massachusetts Department of Environmental Protection and any successor departments or agencies of the Commonwealth.

v.    "Municipal Separate Storm Sewer System" or "MS4" shall mean a system of municipal conveyances designed to collect, convey, and discharge stormwater to receiving waters.

w.    "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper or lower case letter.

x.    "Parties" shall mean the United States and the City of Lawrence, Massachusetts.

y.    "Sanitary Sewer Overflow" or "SSO" shall mean any overflow, spill, diversion, or release of wastewater from, or caused by, conditions in the Collection System. SSOs include, but are not limited to, discharges to waters of the United States from the Collection System, as well as any release of wastewater from the Collection System to public or private property that does not reach waters of the United States, including wastewater backups onto public streets, into buildings, or onto private property.

z.    "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

aa.    "Sewershed" shall mean a major portion of the Collection System that drains to one, or a limited number of, major sewer(s).

bb.    "Sub-catchment" shall mean the geographical area served by and drained to a

9

distinct portion of the City's MS4.

cc. "Sub-watershed," for the purpose of this Consent Decree only, shall mean the land that serves as a drainage basin to the Shawsheen River, the Spicket River, the Merrimack River, and any tributaries.

dd. "United States" and "U.S." shall mean the United States of America, acting on behalf of EPA.

## V. OBJECTIVES

7. It is the express purpose of the Parties in entering into this Consent Decree to require the City to take all measures necessary to fulfill the objectives of the CWA, and to achieve and maintain compliance with the Small MS4 General Permit, the GLSD Permit, the CWA, the Massachusetts Clean Waters Act, M.G.L. c. 21, §§ 26 through 53 ("Massachusetts Act"), any NPDES permits that may be issued to the City in the future, and any applicable federal or Commonwealth regulations.

8. Engineering designs and analyses required to be performed pursuant to this Consent Decree shall be conducted using sound, generally accepted engineering practices, and, as applicable, consistent with: (a) EPA's "Handbook: Sewer System Infrastructure Analysis and Rehabilitation," EPA/625/6-91-030, October 1991; (b) EPA's "Handbook for Sewer System Evaluation and Rehabilitation," EPA/430/9-75-021, December 1975; (c) the currently effective edition of "Existing Sewer Evaluation and Rehabilitation," WEF MOP FD-6; (d) "Guide to Short Term Flow Surveys of Sewer Systems," WRC Engineering (Undated); (e) the National Association of Sewer Service Companies "Manual of Practice;" (f) the Massachusetts Department of Environmental Protection's document entitled "Guidelines for Performing

10

Infiltration/Inflow Analysis and Sewer System Evaluation Survey," revised January 1993; (g) the currently effective edition of "TR 16: Guides for the Design of Wastewater Treatment Works;" and (h) EPA's "Stormwater Best Management Practices (BMP) Performance Analysis," revised March 2010 (Tetra Tech, Inc.). Should there be a conflict between two or more of these sources, EPA's judgment as to which source to follow shall control.

VI.   REMEDIAL MEASURES

A.   Monitoring for IDDE Program

9.    By December 31, 2014, the City shall submit to EPA for review and Approval an IDDE Monitoring Plan for 22 outfalls that the City has identified as the primary separate storm drain outfalls. By June 30, 2015, the City shall submit to EPA for review and Approval an updated IDDE Monitoring Plan for all known MS4 outfalls and interconnections to other MS4s. The IDDE Monitoring Plan shall include a list, providing a unique identifier and latitude/longitude coordinates for each MS4 outfall, and a map showing the location of each outfall and interconnection.

12.   Dry-weather inspections: By December 31, 2014, under dry-weather conditions (less than 0.1 inches of rain in the preceding 48 hours and no significant snowmelt), the City shall inspect 22 outfalls identified as the primary separate storm drain discharge locations MS4 outfalls and sample those with Flow. By June 30, 2015, under dry-weather conditions, the City shall inspect all known outfalls and interconnections to other MS4s and sample those with Flow. Outfall and interconnection discharge samples shall be analyzed for E. coli bacteria, surfactants, ammonia, and total residual chlorine using instrumentation defined in Table 1 of the Draft EPA Bacterial Source Tracking Protocol (included in this Consent Decree as Appendix A). The City

11

shall maintain detailed and accurate records of the date and time that sampling was conducted and the weather conditions both during, and in the 48 hours prior to, each sampling event.

13.     Wet-weather inspections: By December 31, 2014, at least once during wet weather conditions, the City shall sample 22 outfalls identified as the primary separate storm drain discharge locations. By June 30, 2015, under wet-weather conditions, the City shall sample all known outfalls and interconnections to other MS4s. For the purposes of sampling outfalls or interconnections, "wet-weather conditions" should consist of at least 0.25-inches of rain over the 24 hour period prior to sampling. To facilitate sample planning and execution, however, precipitation events sufficient to produce any Flow in outfalls or interconnections to be sampled will also be acceptable. Outfall or interconnection discharge samples shall be analyzed for E. coli bacteria, surfactants, ammonia, and total residual chlorine using instrumentation defined in Table 1 of the Draft EPA Bacterial Source Tracking Protocol (included in this Consent Decree as Appendix A). The City shall maintain detailed and accurate records of the date and time that sampling was conducted and the weather conditions both during, and in the 24 hours prior to, each sampling event.

B.     MS4 Sub-Catchment Area Illicit Discharge Investigations

14.     By December 31, 2014, the City shall submit to EPA for review and Approval an IDDE Investigation Plan for screening and monitoring of outfalls and interconnections, investigation of sub-catchment areas, and identification of illicit discharges. The IDDE Investigation Plan shall be consistent with the draft EPA New England Bacterial Source Tracking Protocol dated January 2012 (included as Appendix A) and this Consent Decree. The City shall utilize the following screening thresholds as guidelines for IDDE Investigation Plan:

12

Bacteria:     Class A or B waters - E. coli: greater than 235 coliform forming

              units /100 milliliters ("cfu/100 ml")

Surfactants:  equal to or greater than 0.25 milligrams per liter ("mg/l") (via field

              kits) or 0.1 mg/l via laboratory analysis

Ammonia:      equal to or greater than 0.5 mg/l

Total residual chlorine:  greater than non-detect (0.02 mg/l method detection

              limit)

15.   By December 31, 2014, the City shall submit to EPA for review and Approval:

a.   A priority ranking of the 22 previously identified most critical sub-catchment areas based on all information and data available, including monitoring results, that is consistent with the City's IDDE Investigation Plan;

b.   An MS4 Sub-catchment area map showing the boundaries of each Sub-catchment area;

c.   By June 30, 2015, the City shall submit to EPA for review and approval an updated priority ranking of all Sub-catchment areas based on all information and data available, including monitoring and investigation results, that is consistent with the City's IDDE Monitoring and Investigation Plan and an MS4 Sub-catchment area map showing the boundaries of each Sub-catchment area.

16.   By June 30, 2015, the City shall complete an investigation of the MS4 Sub-catchment area tributary to the outfall near South Lawrence East Elementary School that is consistent with the City's IDDE Investigations Plan. A map and sampling results of the outfall near the South Lawrence East Elementary School are included in Appendix B.

13

17. By June 30, 2015, the City shall complete investigation of the MS4 Sub-catchment area tributary to the outfall to the east of the Abe Bashara Community Boathouse that is consistent with the City's IDDE Investigations Plan. A map and sampling results of the outfall to the east of the Abe Bashara Community Boathouse are included in Appendix B.

18. By June 30, 2015, the City shall complete investigation of the MS4 Sub-catchment area tributary to the outfall to the south of the Abe Bashara Community Boathouse that is consistent with the City's IDDE Investigations Plan. A map and sampling results of the outfall to the south of the Abe Bashara Community Boathouse are included in Appendix B.

19. By September 30, 2015, the City shall complete investigation of the MS4 Sub-catchment area tributary to the outfall near Doyle Street that is consistent with the City's IDDE Investigations Plan. A map and sampling results of the outfall near Doyle Street are included in Appendix B.

20. By September 30, 2015, the City shall complete investigation of the MS4 Sub-catchment area tributary to the outfall near the Dr. Nina Scarito Park that is consistent with the City's IDDE Investigations Plan. A map and sampling results of the outfall near the Dr. Nina Scarito Park are included in Appendix B.

21. Investigations of all Sub-catchment areas discharging from the City's system will be conducted according to the City's priority ranking order and will be completed within three (3) years of the Date of lodging of the Consent Decree.

C.    Illicit Discharge Prohibition and Removal

22. By March 31, 2015, the City shall effectively prohibit, through an ordinance or other regulatory mechanism, non-stormwater discharges into the MS4 as required by Part

14

II.B.3(b) of the Small MS4 General Permit. For purposes of this Consent Decree, the "date of verification" of an illicit discharge shall be the date on which the City has identified a point of entry from a specific location or address that contributes wastewater flow to the MS4 system.

23. By December 31, 2014, the City shall submit to EPA for review and approval an Illicit Discharge Abatement Plan. The Illicit Discharge Abatement Plan shall include the following schedule for removal of illicit discharges and submittal of an Alternative Schedule:

a. Except as circumstances require an Alternative Schedule, all illicit discharges shall be removed within sixty (60) days of the date of verification.

b. If the City cannot remove an illicit discharge within 60 Days of the date of verification, or within 60 Days of the Effective Date for illicit discharges verified before the Effective Date, the City shall submit for review and Approval a schedule to both EPA and MassDEP to remove the illicit discharge(s) as expeditiously as possible. The City shall meet milestones in such schedule unless EPA or MassDEP respond to the submitted proposal with a different date in accordance with Paragraph 53. Schedules for removal of verified illicit discharges shall be consistent with the following criteria unless special design requirements dictate an alternative schedule:

i. Within 30 Days of the date of verification, or within 30 Days of the Effective Date for illicit discharges verified before the Effective Date, if the City determines that the removal of the illicit discharge is the responsibility of the property owner, the City shall notify the property owner in writing, sent both by certified mail/return receipt requested and regular mail, that it is responsible for eliminating the illicit discharge.

15

ii. If the City determines that removal of the illicit discharge is the responsibility of the property owner, and the property owner has not eliminated the illicit discharge, within sixty (60) days of the date of verification, or within sixty (60) days of the Date of lodging of this Consent Decree for existing verified illicit discharges, the City's legal department shall send the property owner a letter that notifies the property owner of its responsibility to remove the illicit discharge as expeditiously as possible, the legal consequences of its failure to do so, and details the range of available enforcement options from penalties to terminating service.

iii. If the City determines that removal of the illicit discharge is the responsibility of the property owner, and the property owner has not eliminated the illicit discharge within ninety (90) days of the date of verification, or within ninety (90) days of the Date of lodging of this Consent Decree for existing verified illicit discharges, the City's legal department shall send the property owner a second letter. This letter shall notify the property owner that imposition of fines is commencing, that fines will continue to escalate until removal of the illicit discharge, and that fines will be included in the property owner's water and sewer bill. In addition, the letter shall enumerate further actions that the City may take in accordance with its regulations governing the use of sanitary and combined sewers and storm drains. Thereafter, the City's legal department shall diligently prosecute its action against the property owner for removal of the illicit discharge. Under Section VII (Compliance Reporting) of this Consent Decree, the City shall report on each legal action and the steps it has taken to escalate enforcement.

24. Within 60 days following the removal of a verified illicit discharge, the City shall

conduct additional dry- and wet-weather monitoring, bracketing the verified illicit discharge, to confirm that the illicit discharge has been eliminated.

25. The City shall comply with all schedules for removal of verified illicit discharges established pursuant to Paragraph 23.

## D. SSOs

26. The City shall implement operation and maintenance practices and enforce sewer use ordinances to cease all SSOs.

27. Beginning thirty (30) days after the Date of lodging of this Consent Decree, the City shall report all future SSOs, whether to surface waters or buildings or property in the City, to EPA via email at melcher.john@epa.gov or via facsimile at (617) 918-0663. SSO events shall be tabulated in a database and located on a map of the Collection System in accordance with Paragraph 33. An initial report shall be submitted to EPA within 24 hours, providing all information available at the time. A written report shall be submitted to EPA within five days. The initial electronic report and the database shall include, but need not be limited to, the following information:

a. The date and time that the event began, if known, and was discovered by, or reported to, the City and the date the event was stopped, or if it is continuing, a schedule for its termination;

b. The location, including nearest property address, of each such event;

c. The source of notification (property owner, field crew, police, etc.);

d. The specific cause of the event, including but not limited to whether it was caused by debris, fats, oils, and grease, or root blockages; collapsed pipes; mechanical, electrical,

17

or structural failures; hydraulic overloads; and/or vandalism;

    e. The estimated gallons of wastewater released and the method used to estimate the volume;

    f. A clear statement of whether or not the release entered a stormwater catch basin or any other portion of the City's MS4. If the release occurred to the ground or street, regardless of whether the discharge entered any portion of the MS4, the City shall provide the location and the distance to the nearest down gradient stormwater catch basin and the name of the receiving water to which the catch basin discharges;

    g. If the release did not enter a stormwater catch basin or any other portion of the City's MS4, provide a clear statement of whether the release did or did not enter any surface water. If the release entered a surface water, the City shall include the name of the surface water and a description of the location where the release entered the surface water;

    h. The estimated gallons of wastewater discharged to the MS4 or surface water, and the method used to estimate the volume;

    i. The measures taken to stop the overflow and decontaminate the area affected by the overflow;

    j. The measures taken to prevent future overflows at the same location; and

    k. The date the overflow was reported to EPA and MassDEP.

28. The reporting requirements set forth in this Section do not relieve the City of its obligation to submit any other reports or information as required by Section VII (Compliance Reporting) or by federal, Commonwealth, or local law, regulation or permit.

18

E.  Capacity, Management, Operation, and Maintenance ("CMOM") Program Assessment

29.  By March 31, 2015, the City shall submit to EPA for review and approval:

a.  An inventory of the Collection System that characterizes the age, condition, type of construction, and operation of each element where such information exists and provides for further assessments where warranted;

b.  An assessment of the capacity of critical elements of the Collection System; and

c.  An assessment of the City's current operation and maintenance practices, all of which shall comprise the "CMOM Program Self-Assessment."  The CMOM Program Self-Assessment shall be conducted in accordance with EPA's Guide for Evaluating Capacity, Management, Operation, and Maintenance (CMOM) Programs at Sanitary Sewer Collection Systems (the "Guide for Evaluating CMOM Programs") (included in this Consent Decree as Appendix C).  As part of the CMOM Program Self-Assessment, the City shall complete and submit the Wastewater Collection System CMOM Program Self-Assessment Checklist (the "CMOM Program Self-Assessment Checklist") (included in this Consent Decree as Appendix D), which is a Region 1 modification of the checklist included in the Guide for Evaluating CMOM Programs.

F.  CMOM Corrective Action Plan

30.  By June 30, 2015, the City shall submit to EPA for review and approval a plan ("the CMOM Corrective Action Plan") that shall include the following:

a.  A list of any deficiencies identified by the CMOM Program Self-Assessment;

b.  A list of causes and contributing factors that led to the overflows identified in

19

the response to this Consent Decree and the CMOM program Self-Assessment Checklist;

c.  A description of the specific short and long-term actions that the City is taking, or plans to take, to address any of the deficiencies identified during the completion of the CMOM Program Self-Assessment Checklist; and

d.  A schedule for implementation of the CMOM Corrective Action Plan (the "CMOM Corrective Action Plan Implementation Schedule").

31.  Upon approval by EPA, the City shall implement the CMOM Corrective Action Plan as approved by EPA, in accordance with the schedule set forth therein.

G.  CMOM Program Document

32.  By September 1, 2015, the City shall consolidate all of the Collection System preventative and reactive maintenance programs and Collection System capital improvement plans into a single CMOM Program document. The CMOM Program document shall be maintained at a location that is readily accessible to the City's maintenance staff, and is available for inspection by EPA and the MassDEP.

33.  Beginning on March 1, 2016, and on each September 1st and March 1st thereafter through termination of this Consent Decree, the City shall submit a "CMOM Program Implementation Semiannual Report" in conjunction with the Compliance Reports submitted pursuant to Section VII of this Consent Decree. The CMOM Program Implementation Semiannual Report shall detail the actions taken by the City during the prior half of the calendar year (i.e., August 1 through January 31 or February 1 through July 31), or known by the City to have been taken by other parties, to resolve the deficiencies identified in the CMOM Corrective Action Plan and to comply with Paragraphs 30 - 32 of this Consent Decree. The CMOM

20

Program Implementation Semiannual Report shall also include:

    a.  A list of SSO events that occurred during the reporting period, including all releases with a reasonable potential to reach surfaces waters such as releases to streets or areas with storm drain catch basins; a list of Building/Private Property Backups during the reporting period; and a list of citizen reports of SSO events or Building/Private Property Backups during the reporting period.  The three separate tabular listings of all such events shall be organized chronologically and shall include the information detailed in Paragraph 27;

    b.  A map of the City's Collection System including a notation of the location of each discharge identified for Paragraph 33.a;

    c.  A description of the measures and programs implemented by the City to resolve any of the deficiencies identified pursuant to Paragraphs 29 and 30 and to reduce the frequency, duration, and volume of unauthorized discharges, overflows, spills, and releases from the Sanitary Collection System during the reporting period, including copies of any contracts signed by the City to address any issues identified in the CMOM Corrective Action Plan.  The report shall also include a description of the activities that the City has implemented to measure the effect and success of its efforts;

    d.  Copies of the annual Collection System operation and maintenance budgets for the current and previous City fiscal year noting the source of the funding (e.g., enterprise fund, general tax rate).  Specifically indicate whether a capital replacement fund ("sinking fund") has been established to provide for replacement of aging Collection System infrastructure.  Provide the Collection System maintenance staffing levels for the current City fiscal year including:

21

i.  Budgeted positions;

ii.  Vacant positions; and

iii.  A brief description of the responsibilities of each position, clearly distinguishing Collection System maintenance responsibilities from other public works operations;

e.  A description of any existing or proposed City programs designed to reduce the levels of extraneous flows that enter the City's Collection System and the specific measures that were taken by the City under these programs during the past reporting period including the extent to which Infiltration/Inflow sources are believed to be present in the Collection System;

f.  A description of any existing or proposed City easement maintenance programs for locating and uncovering lost or buried Collection System manholes and the specific measures that were taken by the City under these programs during the past reporting period; and

g.  A projection of the measures that will be taken during the current reporting period to resolve any deficiencies identified in the CMOM Corrective Action Plan and to comply with the Consent Decree.

H.  Third-Year CMOM Program Self-Assessment Checklist

34.  An updated CMOM Program Self-Assessment Checklist shall be submitted in conjunction with the CMOM Program Implementation Semiannual Report required to be submitted with the CMOM Program Semiannual Report due on March 1, 2018.

I.  Fats, Oils, and Grease ("FOG") Program

35.  By June 30, 2015, the City shall submit to EPA for review and approval a FOG Program that ensures that fats, oils, and grease accumulations are not impacting the Collection

22

System capacity and contributing to SSOs. The FOG Program shall, at a minimum, include:

     a.  Specific requirements for the installation or upgrade of FOG control equipment at all food preparation establishments;

     b.  Provisions for periodic and random FOG equipment inspections by the City;

     c.  Enforcement procedures for non-compliant facilities including the ability to assess fines for violations of the program/permit/ordinance;

     d.  A public education program targeted at FOG facilities;

     e.  All necessary modification to local regulations, including the City's and GLSD's Sewer Use Ordinances, to allow full enforcement of the FOG Program including standard operating procedures for escalating enforcement from warnings through penalties;

     f.  An explanation of which department(s) within the City has (have) the authority and will be responsible for (i) managing, (ii) inspecting, and (iii) enforcing the FOG Program;

     g.  A list of all food preparation establishments that includes average daily discharge volume; and

     h.  A proposed schedule for the implementation of the Approved FOG Program (the "FOG Implementation Schedule").

36.  Upon approval or conditional Approval by EPA of the FOG Program, the City shall implement the FOG Program in accordance with the proposed implementation schedule, and as amended by, EPA.

## J.  GIS Maps

37.  By December 31, 2015, the City shall develop a geographic information system

23

("GIS") or other digital map of the Collection System and the MS4 to facilitate the City's operation and maintenance of its Collection System and MS4. Thereafter, on each March 1st and September 1st through termination of this Consent Decree, the City shall submit updated maps reflecting newly developed and/or discovered information, corrections, and modifications for review and Approval by EPA in conjunction with the Compliance Reports submitted pursuant to Section VII (Compliance Reporting) of this Consent Decree. Such mapping shall be designed to provide a comprehensive depiction of key infrastructure and factors influencing the proper operation and maintenance of the Collection System and the MS4, and each update shall include progress toward achieving that design. Mapping themes shall include: water resource and topographic features; sanitary, stormwater, and combined sewer infrastructure; prior investigation and study findings; cleaning and repair activities; and capital projects. The scale and detail of the maps shall be appropriate to facilitate a clear understanding of the Collection System and the MS4 by the City, EPA, and MassDEP. In addition, the mapping shall serve as a planning tool for the implementation of future remedial measures, shall delineate the extent of completed and planned investigations and corrections, and other related capital projects. To ensure legible mapping, information shall be grouped appropriately and represented thematically (e.g., by color coding) with legends or schedules where possible. Mapping shall be updated as necessary to reflect newly developed and discovered information, corrections, or modifications. The following information and features shall, at a minimum, be included in the mapping:

Base Map

- Municipal boundaries;

- Street names;

24

- Private property delineations;

Water Resources and Topographic Features

- Water bodics and watercourses identified by name and all use impairments identified in Massachusetts' most recent Integrated List of Waters prepared to fulfill reporting requirements of Section 303(d) of the Clean Water Act;

- Topography;

Infrastructure

- MS4:

  - outfalls;

  - pipes (including size and material);

  - open channel conveyances (e.g., swales, ditches);

  - catch basins;

  - manholes;

  - inter-municipal connections;

  - municipally-owned stormwater treatment structures (e.g., detention and retention basins, infiltration systems, bioretention areas, water quality swales, gross particle separators, oil/water separators, or other proprietary systems);

  - delineation of catchment areas for each outfall;

- Collection System:

  - pipes (including size, material, and approximate age);

  - flow type (e.g., pressure, vacuum, gravity);

  - manholes;

25

- o  pump stations (public and private), and other key sewer appurtenances;

- o  locations of GLSD interceptor sewers;

- o  delineation of catchment areas for each connection to the GLSD interceptor sewer;

- Sewersheds or sewer alignments experiencing inadequate level of service (with indication of reason(s));

- Common/twin-invert manholes or structures (i.e., structures serving or housing both separate storm and sanitary sewers);

- Collection System alignments served by known or suspected underdrain systems;

- Sewer alignments with common trench construction and major crossings representing high potential for communication during high groundwater conditions;

Investigations, Remediation, and Capital Projects completed on or after January 1, 2014 for the MS4 and Collection System:

- Alignments, dates, and thematic representation of work completed (with legend) of past investigations (e.g. flow isolation, dye testing, closed-circuit television, etc.);

- Locations of suspected, confirmed, and corrected illicit discharges (with dates and flow estimates) to the MS4;

- Alignments and dates of past and planned infrastructure remediation projects;

- Planned Collection System and MS4 capital projects; and

- Proposed phasing of future capital projects.

### K.   Emergency Response Plan

38.   By December 31, 2014, the City shall develop and submit for Approval by EPA an Emergency Response Plan. The City shall design the Emergency Response Plan as a reference

guide for its employees to ensure that:

a.   Should SSOs occur, the City will minimize the volume of untreated wastewater discharged to the environment and the impact of the discharge to the environment and public health;

b.   the City responds to and halts all SSOs as rapidly as possible;

c.   Appropriate mitigation measures are employed; and

d.   Appropriate measures are implemented to prevent recurrence of SSOs at the same location.

39.   The Emergency Response Plan shall set forth procedures for responding to SSOs to minimize the environmental impact and potential human health risk.  The Emergency Response Plan shall include, at a minimum:

a.   Procedures to make the public aware of SSOs and measures to prevent public access to, and contact with, areas affected by SSOs;

b.   Procedures to provide timely notice to EPA, MassDEP, Massachusetts Division of Marine Fisheries, and local public health officials of SSOs;

c.   An emergency 24-hour telephone number that can be used by the public to report SSOs;

d.   A quarterly review of the City's equipment to ensure availability of the equipment necessary to respond to SSOs and to implement the Emergency Response Plan;

e.   Procedures to ensure the rapid dispatch of personnel and equipment to correct, to repair or to mitigate the condition causing or contributing to any SSO;

f.   Procedures to ensure the preparedness, including responsiveness training, of

27

the City's employees and contractors necessary for effective implementation of the Emergency Response Plan;

g. A system to track SSO reports and other complaints and related repairs, and to investigate the causes of any SSOs;

h. Safety training relevant to SSO response for all Collection System maintenance personnel;

i. Procedures to ensure that the City will respond to and halt or contain SSOs as soon as reasonably practicable;

j. Procedures to provide information to residents experiencing Building/Private Property Backups resulting from blockages and surcharges of the Collection System regarding prevention, clean up, and disposal of wastewater pumped from buildings;

k. Procedures for investigating and documenting the causes of Building/Private Property Backups resulting from blocking or surcharges from the Collection System; and

l. A method and schedule, with respect to all SSOs: (1) to publicize on local cable television, local newspapers, and on the City's internet site information regarding how to report all SSOs to a single point of contact within the City; and (2) for the City, in turn, to report all SSOs to EPA, in accordance with the requirements set forth in Section VII of this Consent Decree.

40. Upon Approval by EPA, the City shall immediately and continuously implement the Emergency Response Plan, as Approved by EPA.

### L. Construction Site Stormwater

41. By March 31, 2015, the City shall require sediment and erosion control at

construction sites through an ordinance or other regulatory mechanism as required by Part II(B)(4)(a) of the Small MS4 General Permit.

42. By March 31, 2015, the City shall develop and submit Construction Site inspection procedures and an enforcement program and procedures to EPA for review and approval. The enforcement program shall provide for use of a spectrum of enforcement remedies.

43. The City's Construction Site inspection and enforcement program shall require developers to apply for EPA's Construction General Permit, where applicable, and shall require the use and maintenance of appropriate structural and non-structural BMPs designed to minimize the discharge of pollutants from Construction Sites to the City's MS4. The BMPs shall include and emphasize the use of all appropriate available GI/LID techniques. The City's Construction Site inspection and enforcement program shall also require that operators of Construction Sites submit a Stormwater Pollution Prevention Plan ("SWPPP") that meets the requirements of EPA's Construction General Permit and the City's construction program requirements to the City prior to site plan approval and commencement of construction.

44. By March 31, 2015, the City shall commence implementation, and shall continue implementation thereafter, of the revised Construction Site inspection and enforcement procedures, as Approved by EPA.

45. By March 31, 2015, the City shall develop a database to track active Construction Sites. This database shall, at a minimum, contain the following information: the date of site plan review completion; the date construction commenced; the date(s) of any inspections by the City; any findings made and enforcement action taken as a result of those inspections; and any information received from as part of complaints, including the date and nature of the complaint,

29

any inspection conducted, and enforcement action taken. The City shall continue to maintain and update the database as new information is received.

46.   By March 31, 2015, the City shall conduct at least one inspection of each active Construction Site that has the potential to discharge to the City's MS4. The City shall inspect all such Construction Sites existing as of the date of lodging of this Consent Decree at least once. The City shall inspect all new Construction Sites within the first three (3) weeks after the start of construction and all sites within four (4) days after receiving a complaint about discharges.

47.   By March 31, 2015, the City shall conduct training regarding construction site stormwater runoff control for City personnel responsible for implementing the City's Construction Site stormwater inspection and enforcement program. The City shall train all personnel performing Construction Site inspections within thirty (30) days of their commencing employment or assignment to perform said inspections. The City shall provide refresher training at least annually for all personnel performing Construction Site inspections.

48.   By March 31, 2015, the City shall develop, commence, and thereafter continue implementation of procedures for summary review of Construction Site SWPPPs that will be required to be submitted with site plans to assess whether plans reasonably include measures that address potential water quality impacts from construction activities.

49.   By March 31, 2015, the City shall develop a plan with appropriate municipal agencies to ensure notification to appropriate building permit applicants of their potential responsibilities under the NPDES permitting program for construction site runoff as required by Part II(B)(4)(a) of the Small MS4 General Permit.

30

M. Post Construction Stormwater Controls

50. By March 31, 2015, the City shall require management of stormwater runoff at post construction development and redevelopment projects through an ordinance or other regulatory mechanism as required by Part II(B)(5) of the Small MS4 General Permit.

VII. COMPLIANCE REPORTING

51. Beginning on March 1, 2015, and on each March 1st and September 1st thereafter through termination of this Consent Decree, the City shall submit to EPA, for review and comment, Compliance Reports for the previous six-month period (August 1st through January 31st and February 1st through July 31st) ("Reporting Period"). Each Compliance Report shall include, at a minimum, the following items:

 a. An IDDE Semiannual Report including, at a minimum, the following items:

  i. All records from monitoring performed during the Reporting Period in accordance with Paragraphs 12 and 13;

  ii. An updated priority ranking of all Sub-catchment areas, based on all information and data available, including monitoring results;

  iii. An updated MS4 Sub-catchment area map showing the boundaries of each Sub-catchment area;

  iv. A summary of evidence of known or suspected illicit discharges and SSOs for each Sub-catchment under investigation;

  v. An updated listing of all illicit discharges (separately listing illicit connections and sanitary sewer defects) verified through the end of the Reporting Period, including the following:

31

(1)     the date the illicit discharge was verified, the address or location of the illicit discharge, and the type of discharge (*e.g.*, single-family residential, multi-family residential, commercial, industrial, exfiltration from sanitary sewer);

(2)     the estimated flow from the illicit discharge;

(3)     the actions taken by the City to remove the illicit discharge;

(4)     the date the illicit discharge was removed;

(5)     the cost of removing the illicit discharge;

(6)     the resulting volume removed from the MS4 under the IDDE Plan during the Reporting Period for each individual illicit discharge, each Sub-catchment area, and each Sub-watershed area, cumulative for the Reporting Period, and cumulative for all illicit discharges to date;

(7)     a listing of those illicit discharges verified but not removed within sixty (60) days of verification, with an explanation for each;

(8)     the schedule for the removal of each illicit discharge that was not removed within 60 days of identification and an explanation as to why the schedule is as expeditious as possible;

(9)     for each verified illicit discharge that is the responsibility of the property owner where the property owner has not removed the illicit discharge within ninety (90) days of the date of verification, or within ninety (90) days of lodging of this Consent Decree for existing verified illicit discharges, an explanation of the manner in which the City's legal actions have escalated; and

(10)     for each schedule listed in the previous IDDE Semi-Annual

32

Report, specify whether the City complied with its schedule for removal; and if not, the reasons for the delay.

b.   A chart showing the numbers of routine, complaint-response, and total construction inspections and the number of each type of enforcement action taken for violations of the City's regulatory mechanism regarding sediment and erosion control at Construction Sites;

c.   An identification of all plans, reports, and other submissions required by this Consent Decree that the City completed and submitted during the Reporting Period;

d.   A description of the activities undertaken during the Reporting Period directed at achieving compliance with this Consent Decree;

e.   A description of the activities the City plans to undertake during the six (6) months following the Reporting Period in order to achieve compliance with this Consent Decree; and

f.   An identification of any noncompliance with the requirements of this Consent Decree.  If any noncompliance is reported, the notification shall include the following information:

i.   a description of the noncompliance;

ii.   a description of any actions taken or proposed by the City to comply with any lapsed requirements;

iii.   a description of any factors that tend to explain or mitigate the noncompliance; and

iv.   the date by which the City will perform the required action.

52.   The reporting requirements set forth in this Section do not relieve the City of its

obligation to submit any other reports or information as required by federal, Commonwealth, or local law, regulation, or permit. EPA reserves the right to review and require modifications to the above reporting requirements.

## VIII.    APPROVAL OF SUBMISSIONS

53.    After review of any plan, schedule, report, or other item that is required to be submitted for Approval by EPA pursuant to this Consent Decree, EPA shall in writing: (a) approve, in whole or in part, the submission; (b) approve, in whole or in part, the submission with specified conditions; (c) disapprove, in whole or in part, the submission, directing that the City modify the submission; or (d) any combination of the above, and shall provide copies thereof to the City.

54.    In the event of Approval or Approval with conditions by EPA pursuant to Paragraph 53(a) or (b), the plan, schedule, report, or other item, or portion thereof, as Approved or Approved with conditions by EPA, shall be enforceable under this Consent Decree, and the City shall take all actions required to implement such plan, schedule, report, or other item, or portion thereof, in accordance with the Approval or Approval with conditions issued by EPA.

55.    Upon receipt of a written notice of disapproval pursuant to Paragraph 53(c), the City shall, within thirty (30) Days or such other time as the City and EPA agree in writing, correct the deficiencies and resubmit the plan, schedule, report, or other item, or portion thereof, for approval. Any stipulated penalties applicable to the original submission shall accrue during the thirty (30) Day period or other specified period, but shall not be payable unless the resubmission is untimely and/or disapproved as provided in Paragraph 56.

56.    Any resubmitted plan, schedule, report, or other item, or portion thereof, shall be

34

subject to review and Approval by EPA, as provided under this Section. If the City fails to resubmit a plan, schedule, report, or other item, or portion thereof after a disapproval, or if, upon resubmission, the plan, schedule, report, or other item, or portion thereof, is disapproved by EPA, the City shall be deemed to have failed to submit such plan, schedule, report, or other item, or portion thereof, timely and adequately, unless the City invokes the dispute resolution procedures set forth in Section XI (Dispute Resolution) and the City's position is upheld.

57.   Notwithstanding the receipt of a notice of disapproval pursuant to Paragraph 53(c), the City shall proceed, at the direction of EPA, to take any action required by any non-deficient portion of the submission. Implementation of any non-deficient portion of a submission shall not relieve the City of any liability for stipulated penalties under Section IX (Stipulated Penalties) for the deficient portions.

## IX.   STIPULATED PENALTIES

58.   The City shall pay stipulated penalties to the United States for violations of, or noncompliance with, the requirements of this Consent Decree, as set forth below, unless excused under Section X (Force Majeure). A violation or noncompliance includes failing to perform an obligation required by the terms of this Consent Decree, including any work plan or schedule Approved under this Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules or by the date(s) established by or Approved under this Decree. If the United States makes a demand for stipulated penalties, the City may invoke dispute resolution set forth in Section XI.

a.   Reporting & Notice Requirements. For every Day that the City fails timely to submit a report required by Paragraph 51, fails to provide the certification required by Paragraph

85, or fails to provide the Notice required by Paragraphs 4 and 5, the City shall pay a stipulated penalty as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 500 | 1st through 10th Day |
| $ 1,500 | 11th through 20th Day |
| $ 2,500 | 21st Day and beyond. |

b.  Unpermitted Discharges.  For each Day that an SSO occurs, the City shall pay a stipulated penalty of $6,500, unless all of the following conditions are met:  (i) the City stopped the SSO as soon as reasonably practicable; (ii) the City is in full compliance with and is fully implementing the schedules and other requirements set forth pursuant to Section VI of this Consent Decree; and (iii) the City has complied with all reporting requirements for said SSO, including but not limited to those set forth in Paragraph 27 of this Consent Decree.

c.  Remedial Measures.  For every Day that the City fails to timely meet the requirements of Section VII (Remedial Measures) of this Consent Decree, including but not limited to, submitting an Approvable plan, schedule, report, or other item, other than a report required by Paragraph 51, or fails to implement remedial requirements in a plan, schedule, report, or other item Approved by EPA, the City shall pay a stipulated penalty as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 750 | 1st through 10th Day |
| $ 1,000 | 11th through 20th Day |
| $ 2,500 | 21st Day and beyond |

59.  Stipulated penalties shall automatically begin to accrue on the Day after

36

performance is due or on the Day a violation occurs and shall continue to accrue each Day until performance is satisfactorily completed or until the violation or noncompliance ceases. Stipulated penalties shall accrue simultaneously for separate violations of, or instances of noncompliance with, this Consent Decree.

60. Following the United States' determination that the City has failed to comply with a requirement of this Consent Decree, the United States may give the City written notification of the same and describe the noncompliance. The United States may send the City a written demand for the payment of the stipulated penalties. However, the stipulated penalties shall accrue as provided in the preceding Paragraph regardless of whether the United States has notified the City of a violation of, or noncompliance with, the requirements of this Consent Decree, or demanded payment of stipulated penalties.

61. The City shall pay stipulated penalties as specified in this Section by delivering the payment to the United States within thirty (30) Days of the date of a demand for payment of stipulated penalties by the United States. The City shall make payment by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to the City by the United States Attorney's Office for the District of Massachusetts, Financial Litigation Unit, Boston, Massachusetts. The costs of such electronic funds transfer shall be the responsibility of the City. At the time of payment, the City shall send a copy of the EFT authorization form, the EFT transaction record, and a transmittal letter, which shall state that the payment is for the stipulated penalties and shall state for which violation(s) or noncompliance the penalties are being paid pursuant to the Consent Decree in *United States v. City of Lawrence, Massachusetts*, and shall reference the civil action number and DOJ case

37

number 90-5-1-1-11060 to the EPA and the United States Department of Justice as specified in Section XIII (Form of Notice) by email to acctsreceivable.CINWD@epa.gov, and by mail to:

EPA Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268.

62. In the event the City fails to pay stipulated penalties according to the terms of this Consent Decree, such penalty (or portion thereof) shall be subject to interest at the statutory judgment rate set forth at 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for failure of the City to pay any stipulated penalties.

63. Stipulated penalties shall continue to accrue as provided in Paragraph 59, during any dispute resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement or a decision of EPA that is not appealed to the Court, the City shall pay accrued penalties, together with interest, to the United States within thirty (30) Days of the agreement or the receipt of the United States' decision or order.

b. If the dispute is appealed to the Court and the United States prevails in whole or in part, the City shall pay all accrued penalties, together with interest, within sixty (60) Days of receiving the Court's decision or order, to the extent the United States prevails, except as provided in subparagraph c, below.

c. If any Party appeals the District Court's decision, and the United States prevails in whole or in part, the City shall pay all accrued penalties, together with interest, within fifteen (15) Days of receiving the final appellate court decision, to the extent the United States

prevails.

64.  The stipulated penalties set forth above shall be in addition to any other remedies, sanctions, or penalties which may be available by reason of the City's failure to comply with the requirements of this Consent Decree. The United States expressly reserves any and all legal and equitable remedies, including contempt sanctions, which may be available to enforce the provisions of this Consent Decree. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due under this Consent Decree.

## X.     FORCE MAJEURE

65.  "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes entirely beyond the control of the City, of any entity controlled by the City, or of City's engineers, consultants, and contractors, that delays or prevents the timely performance of any obligation under this Consent Decree notwithstanding the City's best efforts to fulfill the obligation.

66.  The requirement that the City exercise "best efforts" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent feasible. "Force Majeure" does not include the City's financial inability to perform any obligation under this Consent Decree. Stipulated Penalties shall not be due for the number of Days of noncompliance caused by a Force Majeure event as defined in this Section, provided that the City complies with the terms of this Section.

67.  If any event occurs that may delay or prevent the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, the City shall notify

39

the United States via email within three (3) working Days after the City first knew or should have known that the event might cause a delay. Within five (5) additional working Days thereafter, the City shall submit for review and Approval by EPA, at the addresses specified in Section XIII (Form of Notice), a written explanation of the cause(s) of any actual or expected delay or noncompliance, the anticipated duration of any delay, the measure(s) taken and to be taken by the City to prevent or minimize the delay, a proposed schedule for the implementation of such measures, and a statement as to whether, in the opinion of the City, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Notwithstanding the foregoing, the City shall notify EPA orally within twenty-four (24) hours of becoming aware of any event that presents an imminent threat to the public health or welfare or the environment and provide written notice to the United States within seventy-two (72) hours of discovery of such event. Failure to provide timely and complete notice in accordance with this Paragraph shall constitute a waiver of any claim of Force Majeure with respect to the event in question. Notifications required by this Paragraph shall be provided consistent with the contact information provided in Section XIII (Form of Notice). Nothing in this Consent Decree should be taken to change or amend existing reporting requirements established by MassDEP for SSO events and facility upsets.

68. If EPA agrees that a delay or anticipated delay is attributable to Force Majeure, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event shall be extended by EPA for a period of time as EPA determines is necessary to complete these obligations. EPA will notify the City in writing of the length of the extension, if any, for completion of the obligations affected by the Force Majeure event.

40

69. If EPA does not agree the delay or anticipated delay is attributable to Force Majeure, or on the number of Days of noncompliance caused by such event, EPA will notify the City in writing of the decision. The City may then elect to initiate the dispute resolution process set forth in Section XI (Dispute Resolution). If the City does not initiate the dispute resolution process set forth in Section XI (Dispute Resolution) within ten (10) Days of receiving EPA's written notice under this Paragraph, then the City shall be deemed to have waived any Force Majeure claims or any rights to initiate dispute resolution with regard to such claims. In any dispute resolution proceeding, the City shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that "best efforts" were exercised to avoid and mitigate the effects of the delay, and that the City complied with the requirements of Paragraph 67, above. If the City carries this burden, the delay at issue shall be deemed not to be a violation by the City of the affected obligation(s) of this Consent Decree.

70. Delay in performance of any obligation under this Consent Decree shall not automatically justify or excuse delay in complying with any subsequent obligation or requirement of this Decree.

71. Failure of the City to obtain any Commonwealth or federal grants or loans shall not be considered a Force Majeure event under this Consent Decree.

XI.    DISPUTE RESOLUTION

72. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures set forth in this Section shall be the exclusive mechanism to resolve

disputes arising under or with respect to this Consent Decree. The City's failure to seek resolution of a dispute under this Section shall preclude the City from raising any such undisputed issue as a defense to an action by the United States to enforce any obligation of the City arising under this Consent Decree. The procedures set forth in this Section shall not apply to actions by the United States to enforce obligations that the City has not disputed in accordance with this Section.

73. Informal Dispute Resolution. Any dispute subject to dispute resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when the City sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute, and shall be accompanied by a Statement of Position that shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the City. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement between the Parties. EPA shall maintain an administrative record of the dispute, which shall contain all statements of the Parties, including supporting documentation, submitted pursuant to this Section.

74. In the event that the City elects to invoke dispute resolution according to this Section, the City shall do so by giving the United States written notice of the existence of the dispute within ten (10) Days after receipt of a notice of disapproval, Approval with conditions or modification, a Force Majeure determination by EPA, or a written demand for payment of stipulated penalties. If the City fails to give such notice, it shall be deemed to have waived any

42

right to invoke dispute resolution regarding such dispute, and the position advanced by the United States shall be considered binding.

75.    If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within thirty (30) Days after the conclusion of the informal negotiation period, the City seeks judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIII (Form of Notice), a motion requesting judicial resolution of the dispute. Any such motion shall contain a written statement of the City's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

76.    The United States shall respond to the City's motion within the time period allowed by the Federal Rules of Civil Procedure and the Local Rules of this Court. The City may file a reply memorandum, to the extent permitted by the Federal Rules of Civil Procedure and the Local Rules.

77.    Standard of Review.

a.    Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, any dispute brought under this Section pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules, or any other items requiring Approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, the City

43

shall have the burden of demonstrating, based upon the administrative record, that the United States' positions are arbitrary and capricious or otherwise not in accordance with law.

b. Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under this Section, the City shall bear the burden of demonstrating that its position complies with this Consent Decree, furthers the objectives of this Consent Decree more positively than the position advanced by the United States, and that the City is entitled to relief under applicable principles of law

78. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of the City under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 63. If the City does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

XII.   RIGHT OF ENTRY/INFORMATION COLLECTION AND RETENTION

79. EPA and their contractors, consultants, and attorneys shall have authority to enter any property and/or facility owned or controlled by the City, at all reasonable times, upon proper identification, for the purposes of: (a) monitoring the progress of activity required by this Consent Decree; (b) verifying any data or information submitted to EPA under this Consent Decree; (c) assessing the City's compliance with this Consent Decree; (d) obtaining samples and, upon request, splits of any samples taken by the City or its representatives, contractors, or consultants; and (e) obtaining documentary evidence, including photographs and similar data.

44

Upon request, EPA shall provide the City splits of any samples taken by EPA.

80.   Until five years after the termination of this Consent Decree, the City shall retain all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) generated by the City, and all data collected and all reports generated by the City's contractors (including data and reports in electronic form), that relate in any manner to the City's performance of its obligations under this Consent Decree. This information retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, the City shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

81.   At the conclusion of the information-retention period provided in the preceding Paragraph, the City shall notify the United States at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, the City shall deliver any such documents, records, or other information to EPA. The City may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If the City asserts such a privilege, it shall provide the following:  (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by the City. However, no documents, records, data, reports or other information created or generated

45

pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

82.  This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of the City to maintain documents, records, or other information imposed by applicable federal laws, regulations, or permits.

## XIII.  FORM OF NOTICE

83.  Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing to the following respective addressees. Any Party may, by written notice to the other Parties, change its designated notice recipient, address, or means of notice (including the substitution of electronic notice via email instead of notice via mail). Notifications, submissions, or communications submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by written agreement of the Parties.

As to the Department of Justice

Chief, Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611 - Ben Franklin Station
Washington, DC  20044
Re:    DJ # 90-5-1-1-11060

46

As to the United States Attorney

Susan M. Poswistilo
Assistant U.S. Attorney
John Joseph Moakley Courthouse
One Courthouse Way, Ste. 9200
Boston, Massachusetts 02210

As to the EPA

John Melcher
Enforcement Officer
Water Technical Unit
U.S. Environmental Protection Agency, Region 1
5 Post Office Square – Suite 100
Mail Code OES04-1
Boston, MA  02109-3912
melcher.john@epa.gov

Michael Wagner
Senior Enforcement Counsel
Office of Environmental Stewardship
U.S. Environmental Protection Agency, Region 1
5 Post Office Square – Suite 100
Mail Code OES04-3
Boston, MA  02109-3912
wagner.michael@epa.gov

As to the City

Mayor Dan Rivera
City of Lawrence
200 Common Street
Lawrence, MA  01840

Brian Pena
Water Commissioner
City of Lawrence
200 Common Street
Lawrence, MA  01840

84.   The City shall submit all notifications, submissions, and communications required

by this Consent Decree to EPA via electronic mail no later than the due date(s) specified in this

47

Consent Decree, in addition to providing a hard copy in accordance with the terms of this Paragraph. The City shall provide complete copies to both John Melcher and Michael Wagner of all other submissions and notices required to be made by the City to EPA pursuant to this Decree; except that with respect to copies of reports, schedules, plans, and other items required to be submitted to Michael Wagner pursuant to Sections VI (Remedial Measures) and VII (Compliance Reporting), only copies of the transmittal letters need be provided. If a submission or notice cannot be provided via electronic mail due to its size, an electronic copy shall be provided by CD-ROM or other similar digital format.

85. All written notices, reports, or any other submissions required of the City by this Consent Decree shall contain the following certification by a duly authorized representative of the City:

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

XIV.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

86. This Consent Decree resolves the civil claims of the United States for the violations

48

alleged in the Complaint filed in this action through the Date of lodging.

87. This Consent Decree is neither a permit nor a modification of any existing permit under any federal, Commonwealth, or local law or regulation. The City is responsible for achieving and maintaining complete compliance with all applicable federal, Commonwealth, and local laws and regulations, and permits, and the City's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that the City's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA or the Massachusetts Act or with any other provisions of federal, Commonwealth, or local laws, regulations, or permits. This Consent Decree shall not be construed to constitute approval by EPA of any equipment or technology installed by the City under the terms of this Consent Decree.

88. This Consent Decree does not limit any rights or remedies available to the United States for any violation by the City of the CWA or associated regulations or permit conditions other than those claims alleged in the Complaint through the Date of lodging. This Consent Decree does not limit any rights or remedies available to the United States for any criminal violations. The United States expressly reserves all rights and remedies, legal and equitable, available to it for all violations of the CWA or other applicable law, except with respect to violations that have been specifically resolved pursuant to Paragraph 86, and reserves all rights and remedies, legal and equitable, available to enforce the provisions of this Consent Decree, including the provisions of any work plan or schedule Approved by EPA under this Decree. Nothing herein shall be construed to limit the power of the United States, consistent with its

49

authorities, to undertake any action against any person, in response to conditions which may present an imminent and substantial endangerment to the public's health or welfare, or the environment.

89.    In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief relating to the City's violations of federal or state law, the City shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 86.

90.    This Consent Decree does not resolve any claims for contingent liability under Section 309(e) of the Clean Water Act, 33 U.S.C. § 1319(e). The United States specifically reserves any such claims against the Commonwealth.

91.    This Consent Decree does not limit or affect the rights of the City or the United States against any third parties not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree against the City, except as otherwise provided by law.

92.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XV.    COSTS

93.    Each Party shall bear its own expenses, costs, and attorney's fees in this action. The

50

Defendant shall be responsible for all expenses, costs and attorney's fees incurred by the United States in collecting any penalties due and payable under Section IX (Stipulated Penalties) of this Consent Decree.

## XVI.   EFFECTIVE DATE

94.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that the City hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date.  In the event the United States withdraws or withholds consent to this Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XVII.   RETENTION OF JURISDICTION

95.    The Court shall retain jurisdiction to modify and enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Consent Decree and to assess any stipulated penalties that may have accrued because of the City's failure to comply with any of its obligations under this Decree.

## XVIII. MODIFICATION

96.    The terms of this Consent Decree, including modifications to any schedule specified in the Consent Decree, may be modified only by a subsequent written agreement signed by each of the Parties.  Where the modification constitutes a material change to the Consent Decree, it shall be effective only upon approval by the Court.  Any disputes concerning modification of this

51

Consent Decree shall be resolved pursuant to Section XI (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 77, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XIX. FUNDING

97. Performance of the terms of this Consent Decree by the City is not conditioned on the receipt of any federal or Commonwealth grant funds or loans, or other financing. In addition, performance is not excused by the lack of federal or Commonwealth grant funds or loans.

## XX. SEVERABILITY

98. The provisions of this Consent Decree shall be severable, and should any provision be declared by a court of competent jurisdiction to be unenforceable, the remaining provisions shall remain in full force and effect.

## XXI. TERMINATION

99. After the City completes all of the requirements of Section VI (Remedial Measures) and Section VII (Compliance Reporting), complies with all other requirements of the Consent Decree, has paid in full all stipulated penalties, and all accrued interest thereon, as required by Section IX (Stipulated Penalties) of this Consent Decree, and has paid in full the costs of litigation, and all accrued interest thereon, as required by Paragraph 93 of this Consent Decree, the City may serve upon the United States a Request for Termination, stating that the City has satisfied those requirements, together with all applicable supporting documentation.

100. Following receipt by the United States of the City's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that they may have

52

as to whether the City has satisfied the requirements for termination of this Consent Decree. If the United States agrees that this Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

101. If the United States does not agree that the Decree may be terminated, the City may invoke dispute resolution under Section XI (Dispute Resolution). However, the City shall not seek dispute resolution of any dispute regarding termination until sixty (60) Days after service of its Request for Termination.

## XXII. FINAL JUDGMENT

102. Entry of this Consent Decree constitutes Final Judgment under Rule 54 of the Federal Rules of Civil Procedure.

## XXIII. WAIVER OF SERVICE

103. The City hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIV. PUBLIC COMMENT

104. This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments received disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate. The City consents to the entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge

53

any provision of this Decree, unless the United States has notified the City in writing that it no longer supports entry of this Decree.

## XXV. SIGNATORIES

105. Each undersigned representative certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

## XXVI. INTEGRATION

106. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

107. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding between the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than submissions that are subsequently submitted and Approved by EPA pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXVII. APPENDICES

108. The following appendices are attached to and part of this Consent Decree:

a. "Appendix A" is EPA New England's Bacterial Source Tracking Protocol, draft, January 2012.

b. "Appendix B" is Maps and Water Quality Monitoring Data from Five Lawrence MS4 Outfalls, March 2014.

c. "Appendix C" is the EPA's Guide for Evaluating Capacity, Management,

Operation, and Maintenance (CMOM) Programs at Sanitary Sewer Collection Systems (EPA

305-B-05-002, January 2005).

d. "Appendix D" is the Wastewater Collection System CMOM Program Self-

Assessment Checklist (the "CMOM Program Self-Assessment Checklist").

Dated and entered this __15th__ day of ___July___, 2015.

UNITED STATES DISTRICT JUDGE
DISTRICT OF MASSACHUSETTS

FOR PLAINTIFF, UNITED STATES OF AMERICA:

CARMEN M. ORTIZ
United States Attorney

SUSAN M. POSWISTILO
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Suite 9200
Boston, MA  02210
(617) 748-3103
susan.poswistilo@usdoj.gov

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

BRIAN G. DONOHUE
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
601 D. St., N.W.
Washington D.C.  20004
(202) 514-5413

FOR DEFENDANT, CITY OF LAWRENCE:

Mayor Dan Rivera
City of Lawrence
200 Common Street
Lawrence, MA  01840

56

FOR PLAINTIFF, UNITED STATES OF AMERICA:

CARMEN M. ORTIZ
United States Attorney

_____

SUSAN M. POSWISTILO
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Suite 9200
Boston, MA  02210
(617) 748-3103
susan.poswistilo@usdoj.gov

SAM HIRSCH
Acting Assistant Attorney General
Environment and Natural Resources Division

_____

BRIAN G. DONOHUE
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
601 D. St., N.W.
Washington D.C.  20004
(202) 514-5413

FOR DEFENDANT, CITY OF LAWRENCE:

_____
Mayor Dan Rivera
City of Lawrence
200 Common Street
Lawrence, MA  01840

56

For the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY


_Susan Studlien_                          _03/24/15_
Susan Studlien                            Date
Director
Office of Environmental Stewardship
United States Environmental Protection Agency, Region 1
5 Post Office Square, Suite 100
Boston, MAa  02109-3912

57

For the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:


_____     __4/6/15__
SUSAN SHINKMAN                           Date
Office Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C.  20460


_____     __4 · 1 · 15__
MARK POLLINS                             Date
Division Director
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C.  20460


_____     __3 · 24 · 15__
JAMES VINCH                              Date
Attorney
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C.  20460

58